26-mj-5089-JGD
26-mj-5090-JGD

# AFFIDAVIT OF SPECIAL AGENT TIMOTHY TABER IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

I, Timothy Taber, having been sworn, state:

## Introduction and Agent Background

1. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and have been so employed since May 2018. I have received formal training in conducting criminal investigations at the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to becoming a Special Agent with HSI, I was an Intelligence Analyst with the Federal Bureau of Investigation for approximately ten years, where I participated in a variety of investigations including violent gangs and drug trafficking. In 2005, I graduated from Northeastern University with a bachelor's degree in criminal justice and from Suffolk University in 2006 with a master's degree in criminal justice.

2. I am currently assigned to the HSI New England Document and Benefit Fraud Task Force ("DBFTF"), a specialized field investigative group comprised of personnel from various state, local, and federal agencies with expertise in detecting, deterring, and disrupting organizations and individuals involved in various types of document, identity, financial, and benefit fraud schemes. As part of this task force, I am responsible for conducting investigations involving, but not limited to, the manufacturing, counterfeiting, alteration, sale, and use of identity documents and other fraudulent documents to evade law enforcement or for other criminal activity. Due to my training and experience, as well as conversations with other law enforcement officers, I am familiar with the methods, routines, and practices of document counterfeiters, vendors, and persons who fraudulently obtain or assume false identities.

3. I have participated in various aspects of investigations into the use and manufacture of fraudulent documents, including conducting physical surveillance, surveillance of controlled

purchases involving undercover agents and/or cooperating witnesses, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and the debriefing of defendants, informants, and witnesses.

**Purpose of Affidavit**

4. I submit this affidavit in support of an application for a search warrant for the following property: 25 Trotter Court, Apt. 265, Boston, Massachusetts 02118 ("Target Residence"), as described in Attachment A-1. I further submit this affidavit in support of an application for a search warrant for the person of Erpawi Roque Collado ("Collado"), as described in Attachment A-2. I have probable cause to believe that this property and the person of Collado contain evidence, fruits, and instrumentalities of violations of: 7 U.S.C. § 2024(b) (Illegal Acquisition or Use of Supplemental Nutrition Assistance Program ("SNAP") Benefits), (the "Target Offense,") as described in Attachment B.

5. This affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and federal agents, and my review of records described herein. This affidavit is not intended to set forth all of the information that I have learned during this investigation but includes only the information necessary to establish probable cause for the requested search warrant.

**Probable Cause**

6. The HSI New England DBFTF is currently investigating a group of individuals who are believed to have obtained stolen identities of United States citizens, most of whom reside in Puerto Rico, and used those identities to obtain public benefits that they would not otherwise be eligible to receive, such as SNAP, Supplemental Security Income ("SSI"), MassHealth, and United States passports.

7. On March 4, 2026 a Complaint was also sought against Collado, Case No. 26-mj-5053-JGD**,** charging him with SNAP Fraud. A copy of the Affidavit in Support of that Complaint is attached hereto and incorporated herein as Exhibit 1.[1]

8. As more fully detailed in Exhibit 1, there is probable cause to believe that Collado has stolen, and is fraudulently using, the identity of a victim whose initials are J.L.C.[2] There is further probable cause to believe that Collado has used that identity to: (1) fraudulently obtain Massachusetts SNAP benefits in the name of the victim; and (2) fraudulently obtain MassHealth benefits in the name of the victim. Exhibit 1, ¶¶ 11-36.

**THE TARGET RESIDENCE**

9. The Target Residence is the only address that appears on Collado's current MA criminal history record.[3]

10. On May 31, 2023, Boston Police Department ("BPD") executed an arrest warrant for Collado (under the name J.L.) and two state search warrants, including one for the Target Residence and one for Collado's person. Roxbury District Court # 2302 SW 0067 and 0068. Per review of a BPD report, Collado was observed to exit Ditmus Court in Roxbury and proceed on Kendall Street towards Trotter Court. With badges displayed, BPD approached Collado (as J.L.), advised him of his *Miranda* warnings, informed him of the warrants for his person and residence and recovered a set of keys from Collado person. Collado advised officers that a single key opened the locking mechanism to 25 Trotter Court, Apartment #265. BPD utilized the key recovered from

---

[1] The Affidavit has been Ordered sealed.

[2] The identity of victim J.L.C. is known to the government. The victim's full name is J.L.C. In order, these initials represent the victim's first name, paternal last name, and maternal last name. To protect the victim's privacy, only the initials "J.L.C." and "J.L." are used in this affidavit to reflect the variations of the victim's full name.

[3] I am unaware of how or on what date that address was listed on the current MA criminal history record.

Collado during and after knocking and announcing their purpose with no response, utilized the keys and conducted entry into the Target Residence. Collado's family member was inside the apartment and confirmed which room was Collado's. From that bedroom, BPD seized numerous items from the Target Residence including, but not limited to, two firearms, ammunition, suspected cocaine, and suspected fentanyl. As a result of the warrants, Collado was charged in state court with firearm and narcotics offenses. *See* docket # 2484CR00188.

11. On February 25, 2026, Homeland Security Investigations ("HSI") initiated surveillance in the area of the Target Residence. HSI observed the name Collado written on a piece of paper and taped to the front door.[4] At approximately 8:53 am, HSI observed a male matching the physical description of Collado[5], exit the front door of the Target Residence.[6]

12. HSI has spoken with security at the apartment complex which includes the Target Residence. On or about March 5, 2026, HSI agents reviewed electronic video surveillance of a male, matching the physical description of Collado, exiting and/or entering the Target Residence on the following dates:

a) On February 14, 2026, at approximately 3:14 pm, a male matching the physical description of Collado, was observed on video wearing a red and black sweatshirt and a blue coat, exiting the Target Residence.

b) On March 2, 2026, at approximately 10:17 am, a male matching the physical

---

[4] We believe that Collado's mother resides at the Target Residence and has the same last name as Collado.

[5] Physical description matches were based on RMV records and booking photographs of Collado.

[6] According to Collado's booking sheet from Suffolk County from April 22, 2025, Collado's address was listed as 1041 Hyde Park Avenue, Boston, MA. Additionally, per a Weymouth Police Department booking report (related to a straight arrest warrant that had previously issued for Collado as J.L.) and dated April 19, 2025, Collado (under the name J.L.) provided an address in Providence, RI, as his home address which is different than the Target Residence.

description of Collado, as well as an unknown male wearing a red sweatshirt and black pants, were observed exiting the Target Residence.

c) On March 4, 2026, at approximately 11:43 am, a male matching the physical description of Collado, wearing a similar red and black sweatshirt as the individual observed exiting the Target Residence on February 14, 2026 (as described above), as well as an unknown male wearing a red sweatshirt and black pants, were observed entering the Target Residence. That second male appears to be the same unknown male who was observed with Collado on video surveillance on March 2, 2026. Below is a screenshot of Collado and the unknown male from the March 4, 2026 video surveillance:

26-mj-5089-JGD
26-mj-5090-JGD



26-mj-5089-JGD
26-mj-5090-JGD

**PROBABLE CAUSE TO BELIEVE THAT EVIDENCE, FRUITS, AND INSTRUMENTALITIES WILL BE LOCATED AT THE TARGET RESIDENCE**

13. I know, based on my training and experience, that it is reasonable to expect to find physical evidence of the Target Offense in the Target Residence. In this regard:

a) All individuals, criminals and otherwise, often retain their true identification documents, including but not limited to birth certificates, passports, and proof of citizenship, in their residences for safekeeping. This remains true for those using false identities.

b) It is common for those who use other persons' identities without authorization to conceal fraudulently obtained identification documents in secure locations within their residences to conceal them from law enforcement authorities and to allow for easy access and use when necessary; and

c) It is common for individuals who use fraudulently obtained identification documents to retain those documents for substantial periods of time so that they can continue to use the fraudulently obtained identities as needed.

14. Further, individuals often keep identification documents for long periods – sometimes years – and tend to retain such documents even when they depart a given residence. Such documents include driver's licenses, social security cards, bank cards, credit cards, bank records, and bank statements. By way of example, a MA driver's license is often issued for a five-year period and is kept by individuals even when they move to a new residence.

15. I also know, based on my training and experience, that it is reasonable to expect to find evidence of the Target Offenses on computers and electronic devices in the Target Residence.

16. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their daily actions

by communicating about them through e mail, instant messages, and updates to online social networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online. In a case involving a stolen identity, the name in which Collado utilizes such services would serve as evidence of the Target Offenses.

17. Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data.

18. I am aware of a 2024 report from the United States Census Bureau that shows that among all households nationally in 2021, 95 percent had at least one type of computer, which includes smartphones, and 90 percent had a broadband internet subscription—up from 89 percent (computer) and 82 percent (internet subscription) in 2016. Smartphones were the most common computing device in U.S. households (90 percent), followed by desktop or laptop computers (81 percent) or tablets (64 percent). Further, according to the Pew Research Center, as of November 2024, 98 percent of adult Americans own a cellphone of some kind, and 91 percent own a smartphone. The percentage of adults that own a smartphone is even higher among younger demographic groups: 98 percent of 18-29 year olds, 97 percent of 30-49 year olds, and 91 percent of 50-64 year olds owned smartphones in 2024. Seventy-nine percent of those 65 years and older owned a smartphone. Agents have not yet been able to locate a phone subscribed in Collado's name (or that of J.L.), however, in his June 10, 2025 MassHealth application, Collado listed a

phone number of (xxx) xxx-8472 showing he has access to or used a phone while using the victim's identity.

19. Where, as in this case, there is probable cause to believe that an individual has stolen the identity of another person, examining data stored on electronic devices of this type can uncover, among other things:

a) evidence of what name was used to address Collado when individuals communicated with the user of the device in electronic communications such as texts, messages, or emails. These communications would provide evidence that Collado is using the J.L.C. identity in communicating with others, but, could also reveal that Collado uses his real name when communicating with individuals who know him by his real identity; and

b) evidence of social media, website, or other internet-based applications or accounts in which Colado has used the J.L.C. identity and/or that Collado has used his real name when utilizing those services.

20. Based on my training, experience, and information provided by other law enforcement officers, as well as by reviewing the MA DTA website, I am aware that that MA DTA hosts a website, which allows users to find out if they are eligible for SNAP, apply for SNAP benefits, complete certifications and re certifications, and view balances, among other things. See https://www.mass.gov/orgs/department-of-transitional-assistance (last visited February 13, 2026). I am also aware that MA DTA offers an "App" on both Apple and Google devices. Per the description in the Apple App Store, the "DTA Connect" App allows users to, among other things : (1) view SNAP case status; (2) check balances; (3) find out when benefits will next be issued; (4)

upload documents to DTA; (5) find out if documents have been processed; (6) get alerts; and (7) update contact information.

21. Based on my training, experience, and information provided by other law enforcement officers, as well as by reviewing the MassHealth website, I am aware that MassHealth maintains a website that allows members to create an online account "to get information about your Masshealth … coverage." See https://www.mass.gov/masshealth-ma-login-accounts (last visited February 13, 2026).

22. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a) Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b) Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c) Wholly apart from user generated files, computer storage media -in particular, computers' internal hard drives - contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This

evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d) Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e) Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

23. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs,

may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

24. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

25. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

26. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

27. Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

a) The volume of evidence - storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on site.

b) Technical requirements - analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden,"

> deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

28. The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

29. The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with Collado. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

**UNLOCKING A DEVICE USING BIOMETRIC FEATURES**

30. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

31. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through their fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

32. If a device is equipped with a facial-recognition feature, as many Android, Apple, and other devices are, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face. Similar technology

allows users to unlock a device specifically through iris recognition.

33. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

34. As discussed in this affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

35. I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances, even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be unlocked using Touch ID when a certain period of time has elapsed since the device was last unlocked and/or when the device has not been unlocked using a fingerprint and the passcode or password has not been entered in a certain period of time. Similarly, certain Android devices cannot be unlocked with Trusted Face or fingerprint access if the device has remained inactive for a certain number of hours. Other Android and Apple biometric features, and similar features from other brands, carry similar restrictions. Thus, in the

event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

36. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose biometric features are among those that will unlock the device(s), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require Collado to press his finger(s) against the sensor of the locked device(s) or place the devices in front of his face in order to attempt to identify the device's user(s) and unlock the device(s).

37. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of Collado to the fingerprint scanner of the devices found at the Target Premises; (2) hold the devices found at the Target Premises in front of Collado and activate the facial recognition feature; and/or (3) hold the devices found at the Target Premises in front of the face of Collado and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that any person state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the

proposed warrant does not authorize law enforcement to compel any person to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices. I understand that if any person present refuses to cooperate, the matter must be resolved through contempt proceedings rather than through the application of unreasonable physical force.

38. I further request that the Court authorize law enforcement to change device settings on any seized device(s) to disable "Stolen Device Protection," which is a security measure that can be used to prevent unauthorized access to the device and data. When enabled, however, this feature might prevent forensic tools from being able to extract data from devices.

## Conclusion

39. Based on all of the foregoing, I submit there is probable cause to believe that Collado has committed the Target Offense. I further submit that there is probable cause to believe that the Target Residence, and the person of Collado, will contain evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B.

Sworn to under the pains and penalties of perjury,

Timothy Taber

Special Agent Timothy Taber
Homeland Security Investigations

SWORN before me telephonically pursuant to Fed. R. Crim. P. 4.1 this 5th day of March, 2026.

Judith G. Dein

HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE